UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

STERLING PRODUCTS, INC.,

        Plaintiff,

   v.

LUCID CORPORATION,

        Defendant.

Case No. 22-cv-1550-bhl

---

## ORDER GRANTING MOTION TO DISMISS

---

In 2021, Defendant Lucid Corporation (Lucid) contracted with Plaintiff Sterling Products, Inc. d/b/a AEC, Inc. (AEC) for specialized equipment the former needed as part of its start-up polyethylene terephthalate (PET) sheet extrusion business. According to AEC's complaint, it provided the equipment, but Lucid withheld payment. Lucid's counterclaim tells a different story, accusing AEC of committing the initial breach of contract. AEC has moved to dismiss the counterclaim on various grounds. For the following reasons, that motion will be granted.

### FACTUAL BACKGROUND[1]

Lucid is a fresh face in the PET sheet extrusion industry, having only first solicited orders in 2021.[2] (ECF No. 14 at 12.) Even as an industry newcomer, though, Lucid knew the PET sheet extrusion process required certain specialized cooling equipment. (*Id.*) But it had never purchased this sort of equipment before, so it reached out to AEC affiliates for advice. (*Id.*) Through these representatives, AEC recommended a GPWC-40 water chiller and a fiberglass cooling tower. (*Id.*)

On May 12, 2021, AEC sent Lucid a formal quote for the water chiller, including all essential contract terms and a "Terms and Conditions" sheet. (*Id.* at 13; ECF No. 1-3 at 1-10.) About two weeks later, Lucid responded with a purchase order and $12,538.75 down payment.

---

[1] These facts are derived from Lucid's Answer and Counterclaim, (ECF No. 14), the allegations which are presumed true for purposes of the motion to dismiss. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 554-56 (2007).

[2] "Extrusion is a process where a material," in this case a PET sheet, "is pushed through a tool with a specialized shape . . . producing continuous objects of a fixed cross sectional profile." *What is Plastic Extrusion?*, TWI GLOB., https://www.twi-global.com/technical-knowledge/faqs/plastic-extrusion (last visited June 20, 2023).

(ECF No. 14 at 13.)  On June 30, 2021, AEC sent Lucid a second quote, this one for the cooling tower, again including all essential contract terms and the same "Terms and Conditions" sheet. (*Id.* at 13-14; ECF No. 1-7 at 1-14.)  On July 14, 2021, Lucid issued another purchase order along with a $40,876.50 down payment.  (ECF No. 14 at 14.)  That same day, AEC provided Lucid a down payment and pre-ship invoice, both of which listed September 29, 2021, as the scheduled ship date for all components of the cooling tower.  (*Id.*)

The water chiller arrived timely in September 2021.  (*Id.* at 15.)  But AEC did not ship the cooling tower until January 31, 2022, over four months after the promised delivery date.  (*Id.*)  In the meantime, Lucid resorted to renting substitute equipment to fulfill its customers' orders.  (*Id.*)  Rental costs quickly ballooned over $46,000, and even with the rented system, Lucid could not complete all orders as promised.  (*Id.* at 16.)  Believing that AEC's breach vitiated its contractual obligations, Lucid refused to pay the outstanding balances on the water chiller and cooling tower. (*Id.* at 5, 7.)

## LEGAL STANDARD

When deciding a Rule 12(b)(6) motion to dismiss, the Court must "accept all well-pleaded facts as true and draw reasonable inferences in the [non-movant's] favor."  *Roberts v. City of Chi.*, 817 F.3d 561, 564 (7th Cir. 2016) (citing *Lavalais v. Vill. of Melrose Park*, 734 F.3d 629, 632 (7th Cir. 2013)).  Like a complaint, a counterclaim will survive a motion to dismiss if it "state[s] a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## ANALYSIS

AEC's motion to dismiss turns on the applicability of the "Terms and Conditions" it attached to the quotes it sent Lucid.  If the "Terms and Conditions" apply, Lucid's counterclaim is untimely, and the relief it seeks is prohibited.  Understandably then, Lucid stretches for any reason to resist application of the Terms and Conditions, insisting they are: (1) unconscionable; (2) failing of their essential purpose; and (3) unenforceable in their attempt to shrink the statute of limitations. Because none of these arguments has legal merit and the "Terms and Conditions" defeat Lucid's counterclaim, the Court will grant AEC's motion to dismiss.

### I. The Proper Scope of the Contract.[3]

The parties' briefing ventures into "Who's on First?" territory when discussing the particulars of contract formation. Though they bandy about terms like "offer" and "acceptance," and accuse each other of breach, it is apparent that the contracts they envision are not identical. While consensus surrounding the *existence* of a contract is nice, without a uniform understanding of what the contract *is*, the Court risks recreating the Tower of Babel wherein everyone is speaking but no one comprehends. Fortunately, the parties' pleadings provide a chronology of events that confirms, to a legal certainty, when AEC and Lucid went from negotiators to contractually obligated parties.

The first contact between the entities occurred when Lucid appealed to AEC's representatives for advice. (ECF No. 14 at 12.) Following preliminary discussion, AEC issued Lucid two formal quotes that included key details as well as the "Terms and Conditions." (ECF No. 1-3 at 1-10; ECF No. 1-7 at 1-14.) Lucid responded to these quotes with purchase orders. (ECF Nos. 1-4 & 1-8.) AEC then emailed Lucid "Down Payment and Pre-Shipment Invoices," which also incorporated the "Terms and Conditions." (ECF No. 14 at 29-45.) Thereafter, Lucid made the requisite down payments. (ECF No. 20 at 5.) Somewhere along this continuum a contract formed; the question is: Where? The answer requires getting back to basics.

As an attentive first-year law student could tell you, a contract exists where there is "offer, acceptance, and consideration." *Echo, Inc. v. Whitson Co., Inc.*, 121 F.3d 1099, 1103 (7th Cir. 1997). For present purposes, the important ingredients are offer and acceptance. The parties dispute which of them made the offer and which of them accepted it. Lucid's papers imply that its purchase orders were the offers, and AEC's invoices the acceptances. (ECF No. 24 at 3.) AEC believes that its invoices were the offers, and Lucid accepted by way of down payment. (ECF No. 20 at 5.) Their pleadings confirm that neither is correct under long-established principles of contract law.

Based on the parties' common allegations, the offer in this case was the *quote*, and the acceptance was the purchase order. "Generally speaking, 'a price quotation is considered an

---

[3] Because this Court obtained jurisdiction based on diversity of the parties, it must "look to the substantive law of [Wisconsin]" to determine what law applies to the pending dispute. *Wachovia Sec., LLC v. Banco Panamericano, Inc.*, 674 F.3d 743, 751 (7th Cir. 2012). The relevant choice of law factors favor application of Wisconsin law, *see Martin v. Stassen Ins. Agency, Inc.*, No. 2008AP942, 2008 WL 5220283, at *3 (Wis. Ct. App. Dec. 16, 2008), and the parties do not argue to the contrary. The Court will, therefore, apply Wisconsin law to the case.

invitation for an offer, rather than offer to form a binding contract.'" *Rich Prods. Corp. v. Kemutec, Inc.*, 66 F. Supp. 2d 937, 956 (E.D. Wis. 1999) (quoting *White Consol. Indus., Inc. v. McGill Mfg. Co., Inc.*, 165 F.3d 1185, 1190 (8th Cir. 1999)). But if it "reasonably appear[s] from the price quote that assent to the quote is all that is needed to ripen the offer into a contract," then the quote, itself, constitutes an offer. *Id.* (quoting *Brown Mach. v. Hercules, Inc.*, 770 S.W.2d 416, 419 (Mo. App. 1989)). In *Rich Products*, this Court held that a quote constituted an offer when it contained: "(1) A complete description of [the] desired application, with a correspondingly detailed description of the [product] responsive to that application; (2) the quantity of goods; (3) the price; (4) an anticipated delivery date and terms of delivery; and (5) the payment terms." *Id.* at 957. The quotes AEC provided in this case were similarly detailed. (ECF No. 1-3 at 1-10; ECF No. 1-7 at 1-14.) Under such circumstances, a responsive purchase order, like those Lucid issued, signals not the opening salvo but acceptance. The upshot is that Lucid affirmatively accepted the "Terms and Conditions" when it submitted its purchase orders; they were not "unilaterally appended," nor is their incorporation into the agreement subject to debate. (ECF No. 24 at 1.)[4]

## II. The "Terms and Conditions" Apply.

The next question is whether the "Terms and Conditions," as incorporated into the contract, apply to bar Lucid's counterclaim. Generally, courts do not interfere with duly struck bargains between sophisticated entities. *See Levy v. Levy*, 388 N.W.2d 170, 174-75 (Wis. 1986); *see also Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 572 (1972) (holding that the Fourteenth Amendment guarantees "the right of the individual to contract"). And the goal of contract interpretation is not to redistribute the risk and reward evenly among the parties. *See WS Packaging Grp., Inc. v. Glob. Com. Grp., LLC*, No. 06-C-674, 2008 WL 197332, at *2 (E.D. Wis. Jan. 23, 2008) (Courts should not "rewrite the contract so that it reflects one party's, or even the court's, view of what would be reasonable and fair."). But the law also recognizes that, in limited circumstances, a contract is born of such unconscionable circumstances that it cannot be enforced. *See W. Coast Hotel Co. v. Parrish*, 300 U.S. 379, 392-93 (1937). Lucid argues that its contract

---

[4] Because it misapprehended the scope of the contract, Lucid mistook this for a "battle of the forms" case and argued that whether the Terms and Conditions were *incorporated* into the contract could not be decided on the pleadings. (ECF No. 24 at 4-5) (citing *Hydraulics, Int'l, Inc. v. Amalga Composites, Inc.*, 488 F. Supp. 3d 770 775-76 (E.D. Wis. 2020)). But this case is nothing like *Hydraulics* where the two parties to the contract appended their own, contradictory terms and conditions, creating a factual dispute improper for resolution at the motion to dismiss stage. Here, the "Terms and Conditions," as appended to the formal quote, are unequivocally a part of the contract, and the only question is whether there is some legal basis to preclude their *application*.

with AEC fits the mold. The problem for Lucid is that it does not present a plausible case for unconscionability. A sophisticated commercial enterprise, Lucid is lightyears away, in both form and substance from the paradigmatic case of the senile widow conned into selling her home for a fraction of its market value or the oligarchical coal baron who imposes mandatory 16-hour work shifts on his miners. *See Holden v. Hardy*, 169 U.S. 366 (1898). With the benefit of hindsight, Lucid may dislikes the bargain it struck, but that is not cause for this Court to step in and re-write the deal.

### A. The Contract Terms Are Not Unconscionable.

Lucid asserts that it "has pled unconscionability as a defense," and as a result, the Court cannot resolve the applicability of the "Terms and Conditions" on the pleadings. (ECF No. 24 at 8-9.) "Unconscionability has often been described as the absence of meaningful choice on the part of one of the parties, together with contract terms that are unreasonably favorable to the other party." *Wis. Auto Title Loans, Inc. v. Jones*, 714 N.W.2d 155, 165 (Wis. 2006). It "requires a mixture of both procedural and substantive unconscionability that is analyzed on a case-by-case basis." *Id.* Procedural unconscionability concerns factors that bear on the "meaningful choice" element, such as "age, education, intelligence, business acumen and experience, relative bargaining power, who drafted the contract, whether the terms were explained to the weaker party, whether alterations in the printed terms would have been permitted by the drafting party, and whether there were alternative providers of the subject matter of the contract." *Id.* at 165-66. "Substantive unconscionability addresses the fairness and reasonableness of the contract provision subject to challenge." *Id.* at 166. Applying the forgoing to the motion to dismiss stage, to plead an unconscionability defense, a party must allege facts that, presumed as true, plausibly indicate the presence of both substantive and procedural unconscionability.

Lucid paints itself as an exploited, commercial novice now deprived of any recourse for harm suffered. (ECF No. 24 at 2, 6.) But its own pleadings belie this attempt to dress itself up as a helpless victim that lacked the wherewithal and agency to negotiate a fair deal. It concedes that before contracting with AEC, it had engaged in market research, secured a physical location, and solicited orders. (ECF No. 14 at 12.) It also describes its participation in a robust and sophisticated negotiation with AEC. (*Id.* at 13-15.) By its own allegations, Lucid was far from a babe in the woods, at the mercy of its counterparty.

Unconscionability is a rare exception to the general rule of contract enforcement designed to prevent "oppression and unfair surprise" not to disturb "allocation of risks because of superior bargaining power." UNIF. COM. CODE § 2-302, 3 pt. U.L.A. (2022). It derives from English common law where it was "[r]arely applied to commercial contracts . . . [and] mainly served as a defense to prevent quasi-fraud, preserve estates, protect individuals in vulnerable positions, and invalidate foolish agreements." Babette E. Boliek, *Upgrading Unconscionability: A Common Law Ally for a Digital World*, 81 MD. L. REV. 46, 51 (2021). The Uniform Commercial Code codified the doctrine because of the "need for 'distinguishing merchants from housewives and from farmers and from mere lawyers.'" *Id.* at 53 (quoting Ingrid Michelsen Hillinger, *The Article 2 Merchant Rules: Karl Llewellyn's Attempt to Achieve the Good, the True, the Beautiful in Commercial Law*, 73 GEO. L.J. 1141, 1168 (1985)). In short, unconscionability is meant as refuge for the oppressed and outgunned, not wolves who disguise themselves as little old ladies. Lucid falls into the latter camp. It cannot, therefore, plausibly invoke the doctrine of unconscionability to refashion the unfavorable—but not outrageous—terms it agreed to via informed negotiation. *See Deminsky v. Arlington Plastics Mach.*, 657 N.W.2d 411, 424 (Wis. 2003) (refusing to find unconscionability when the parties to a contract "were two commercial entities with prior dealings"). A business must allege much more to invalidate a contract as unconscionable. *See In re First Phoenix-Weston, LLC*, 575 B.R. 828, 844-45 (Bankr. W.D. Wis. 2017) (finding unconscionability in a contract between two commercial entities where one party capitalized twice on the same transaction and the other party was so desperate that it had virtually no bargaining power).

**B. The Contract Terms Do Not Fail of Their Essential Purpose.**

Lucid also argues that the "Terms and Conditions" contemplate remedies so limited that they fail of their essential purpose. Under Wisconsin law, a limited liability clause "fails of its essential purpose" "when the remedy is ineffectual or when the seller fails to live up to the remedy's provisions, either of which deprives the buyer of the benefit of the bargain." *Waukesha Foundry, Inc. v. Indus. Eng'g, Inc.*, 91 F.3d 1002, 1010 (7th Cir. 1996).

Here, Lucid seeks damages for the alleged four-month delay in delivery of the cooling tower. But the "Terms and Conditions" provide:

> In no event shall [AEC] or its affiliates be liable for special, indirect, punitive, incidental or consequential damages, whether in contract, tort or otherwise, including but not limited to loss of profits or revenue, loss of use of the Equipment or any associated equipment,

> cost of capital, cost of substitute equipment, facilities or services,
> downtime costs, *delays*, and claims of customers of [Lucid] or third
> parties for any damages.

(ECF No. 1-7 at 11) (emphasis added). Lucid cites *Schullo v. DeLaval, Inc.*, No. 2011AP1876, 2012 WL 1536339, at *6 (Wis. Ct. App. May 3, 2012) for the proposition that these terms fail of their essential purpose. (ECF No. 24 at 7.) But *Schullo* dealt with a limited "repair or replacement" remedy and held only that such a remedy "fails of its essential purpose whenever . . . the goods are not restored to a non-defective condition within a reasonable time." *Id.* (quoting *Murray v. Holiday Rambler, Inc.*, 265 N.W.2d 513, 522 (Wis. 1978)). Of course, a seller cannot limit a buyer's remedy to repair or replacement and then refuse to repair or replace a defective product, thereby depriving the buyer of any benefit of the bargain. According to Lucid's own pleadings, however, that is not what happened here. The "Terms and Conditions" Lucid agreed to simply limit the available remedies in certain circumstances, and "the fact that a limited remedy provides no relief in one set of circumstances does not mean the remedy fails of its essential purpose." *S. Fin. Grp., LLC v. McFarland State Bank*, 763 F.3d 735, 741 (7th Cir. 2014). "Indeed, the whole point of limiting remedies is to make some remedies unavailable." *Id.* As the Seventh Circuit has bluntly stated: "An agreed remedy does not fail of its essential purpose because it results in the party that bears the risk suffering the risk. Rather, it fails only where a party is unfairly deprived of the *substantial value of its bargain*." *Id.* (emphasis added). Lucid was not deprived the substantial value of its bargain. It received both the water chiller and cooling tower, albeit, slightly behind schedule. It is not in the same position as a consumer who purchases a widget and is subsequently denied both that widget and legal recourse, so it cannot invoke the "fails of its essential purpose" exception.

### C. The Contract Does Not Impermissibly Restrict the Limitations Period.

Even if the Court found certain contract terms unconscionable or eliminated the limited remedies provision, Lucid's claim would remain untimely. The "Terms and Conditions" state:

> All causes of action against [AEC] arising out of or relating to the
> order or the performance by [AEC] or breach of warranty or contract
> by [AEC] shall expire unless brought within one (1) year of the time
> of the act or omission resulting in breach.

(ECF No. 1-7 at 11.) Lucid did not file its counterclaim until well over a year after the time it alleges AEC breached. (ECF No. 20 at 6.) And this is not an instance where the prescribed limitations period is "too short so as to be unreasonable." *Heezen v. Hartland Cicero Mut. Ins.*

*Co.*, 217 N.W.2d 272, 274 (Wis. 1974). Yet Lucid maintains that its action is timely because, under Wisconsin law, it is not a "merchant," and only merchants can agree to reduce the 6-year limitations period typically applied to breach of contract claims. (ECF No. 24 at 5) (citing Wis. Stat. Ann. § 402.725(1)).

"'Merchant' as used in the [Wis. Stat. Ann. § 402.104] is given three alternative definitions: (1) a person who deals in goods of the kind involved in the transaction; (2) a person who holds himself out as having knowledge or skill peculiar to the practices or goods involved in the transaction; or (3) a person to whom such knowledge or skill may be attributed by his employment of an agent or broker or other intermediary who by his occupation holds himself out as having such knowledge or skill." Cnty. of *Milwaukee v. Northrop Data Sys., Inc.*, 602 F.2d 767, 771 (7th Cir. 1979). Lucid's position is, because it had never purchased a water chiller or cooling tower before, it was not acting as a "merchant" when it placed it purchase order. But the definition of "merchant" in Section 402.104 is meant to encompass "almost every person in business", including "banks or even universities" acting in their "mercantile capacity" (as opposed to the case of a managing director purchasing tackle gear for personal use). Wis. Stat. Ann. § 402.104, comment 2 (West 2010). And a business is acting in its "mercantile capacity" when it purchases "goods which are fundamental to its business." *ASD Specialty Healthcare, LLC v. Cmty. First Healthcare of Ill., Inc.*, No. 21 C 06751, 2023 WL 1475117, at *2 (N.D. Ill. Feb. 2, 2023); *see Northrop Data*, 602 F.2d at 772-73 (finding "purchase of a laboratory systems computer [was] sufficiently related to the County's operation of [a] hospital as a professional enterprise that the contract should not be treated as a casual consumer transaction"). Lucid regards itself as a "company in the PET sheet extrusion industry" that provides "customized solutions for [its] customers." (ECF No. 14 at 12.) The extrusion process necessitates purchase of the water chiller and cooling tower at issue in this case. Thus, those instruments are fundamental to Lucid's business, and it was acting in a mercantile capacity when it agreed to purchase them from AEC. As a result, there is nothing untoward about the reduced statute of limitations period in the "Terms and Conditions." And because that shrunken limitations period applies, regardless of anything else, Lucid's counterclaim is untimely.

## CONCLUSION

For the foregoing reasons,

**IT IS HEREBY ORDERED** that AEC's Motion to Dismiss Lucid's Counterclaim, ECF No. 19, is **GRANTED**, and the counterclaim is **dismissed**.

Dated at Milwaukee, Wisconsin on June 23, 2023.

s/ *Brett H. Ludwig*
BRETT H. LUDWIG
United States District Judge
